# RECORD NO. 17-1581

In The

# United States Court Of Appeals
## For The Fourth Circuit

**PHILLIP WADE GRIMES,**
**Personal Representative of the Estate of O. P. G.**

*Plaintiff*

v.

**INNER QUEST INC,**

*Defendant - Appellant*

v.

**YOUNG LIFE, INC.**

*Defendant - Appellee*

and

**ADVENTURE EXPERIENCES, INC.**

*Defendant*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AT ANDERSON

––––––––––––––––

**BRIEF OF APPELLEE**

––––––––––––––––

Jack M. Strauch
STRAUCH GREEN
& MISTRETTA, P.C.
154 Dornach Way
Bermuda Run, NC 27006
(336) 725-8688

*Counsel for Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No.   17-1581(L)        Caption:   Phillip Wade Grimes v. Inner Quest, Inc., et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Young Life, Inc.
(name of party/amicus)


who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.      Does party/amicus have any parent corporations?                  ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                          ☐YES ☑NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Jack M. Strauch _____    Date: _____ 05/30/2017 _____

Counsel for: Young Life, Inc. _____

## CERTIFICATE OF SERVICE
****************************

I certify that on _____ May 30, 2017 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Lee D. Gunn IV, Esquire
Ryan A. Lopez, Esquire
Gunn Law Group, P.A.
401 East Jackson Street, Suite 3600
Tampa, FL 33602
lgunn@gunnlawgroup.com
rlopez@gunnlawgroup.com
(Counsel for Appellee/Plaintiff)

W. Howard Boyd, Esquire
Robert C. Rogers, Esquire
Gallivan White & Boyd, PA
P.O. Box 10589
Greenville, SC 29603
hboyd@gwblawfirm.com
rrogers@gwblawfirm.com
(Counsel for Appellant/Defendant)

/s/ Jack M. Strauch _____        _____ 05/30/2017 _____
(signature)                                                            (date)

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ................................................................ ii

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................1

STATEMENT OF THE CASE................................................................1

    A.    Overview ................................................................1

    B.    Statement of the Facts ........................................................2

          1.    Young Life's Carolina Point Camp Decides to Build a Giant Swing and Wants to Ensure it is Constructed to Specific Safety Standards ...........................................2

          2.    Inner Quest ................................................................4

          3.    Young Life and Inner Quest Discuss the Construction Project ........................................................4

          4.    Contract Formation in North Carolina........................................6

          5.    The Contract's Terms................................................6

          6.    Inner Quest's Pre-Construction Consulting and its Construction of the Giant Swing................................................10

          7.    Inner Quest's Design of the Giant Swing's Passenger Restraint ........................................................12

          8.    Olivia Grimes' Accident ........................................................12

    C.    Procedural Background and Disposition in the District Court ..........13

          1.    The Grimes Lawsuit, Transfer to the District of South Carolina Under 28 U.S.C. § 1406(a) and the Addition of Inner Quest as a Defendant.......................................13

i

2.    Inner Quest's Crossclaim.....................................................14

3.    Summary Judgment Motions, the District Court's Rulings and Inner Quest's Appeal ........................................15

SUMMARY OF THE ARGUMENT ................................................16

ARGUMENT ........................................................................................18

I.    North Carolina Law Governs Inner Quest's Contractual Indemnity Claim, and N.C. Gen. Stat. § 22B-1 Renders the Contract's Indemnity Provision Void and Unenforceable..............18

A.    North Carolina Law Governs Inner Quest's Contractual Indemnity Claim.................................................18

i.    South Carolina's Choice of Law Rules Apply............18

ii.    Because the Contract Was Formed in North Carolina, South Carolina's Well-established *Lex Loci Contractu* Choice of Law Rule Requires Application of North Carolina Law to Issues Concerning the Interpretation and Enforcement of the Contract ..............................................................19

B.    North Carolina General Statute § 22B-1 Renders the Contract's Indemnity Provision Void and Unenforceable Because it Purports to Indemnify Inner Quest for its Own Negligence...............................................22

II.    South Carolina's UCC Choice of Law Provision Does Not Apply ........................................................................................27

A.    South Carolina's UCC Choice of Law Provision Does Not Apply Because The Contract is Predominantly One for Services ........................................................................27

B.   Even if the Contract Is Predominantly One for Goods, South Carolina's UCC Choice of Law Does Not Displace the Common Law Choice of Law Rules Determining Which Law Governs the Enforceability of the Indemnity Clause ..........39

III.   South Carolina Common Law Does Not Follow the Restatement (Second)'s Most Significant Relationship Test .....................................41

IV.   South Carolina Public Policy Does Not Preclude Enforcement of N.C. Gen. Stat. § 22B-1 ..................................................................43

V.   The District Court Correctly Granted Summary Judgment in Favor of Young Life With Respect to Inner Quest's Cross-Claim for Equitable Indemnity............................................................46

CONCLUSION ......................................................................................52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Addy v. Bolton*,
    257 S.C. 28, 183 S.E.2d 708 (1971) ............................................................48

*Ashley II of Charleston, LLC v. PCS Nitrogen, Inc.*,
    409 S.C. 487, 763 S.E.2d 19 (2014) ............................................................44

*Askins v. Firedoor Corp.*,
    281 S.C. 611, 316 S.E.2d 713 (1984) ..........................................................19

*Aviation Associates & Consultants, Inc. v. Jet Time, Inc.*,
    303 S.C. 502, 402 S.E.2d 177 (1991) ..........................................................20

*Bonebrake v. Cox*,
    499 F.2d 951 (8th Cir. 1974) ......................................................................28

*Boone v. Boone*,
    345 S.C. 8, 546 S.E. 2d 191 (2001) ............................................................44

*Branham v. Miller Elec. Co.*,
    237 S.C. 540, 118 S.E.2d 167 (1961) ..........................................................44

*Bridgestone/Firestone, Inc. v. Ogden Plant Maint. Co. of N. Carolina*,
    144 N.C. App. 503, 548 S.E.2d 807 (2001) ................................................24

*Coakley & Williams, Inc. v. Shatterproof Glass Corp.*,
    706 F.2d 456 (4th Cir. 1983) ..............................................................*passim*

*Dawkins v. State*,
    412 S.E.2d 407 (S.C. 1991) ........................................................................45

*Eagle Aviation, Inc. v. Galin*,
    761 F. Supp. 405 (D.S.C. 1989) ................................................................20

iv

*Georgia Bank & Tr. Co. of Augusta v. Trenery, Jr.*,
  No. CIV.A. 3:08-2371-JFA, 2010 WL 3271732
  (D.S.C. Aug. 18, 2010) ................................................................19, 41

*Higdon v. Nestle Purina Petcare Co.*,
  C.A. No. 8:143737-HMH, 2014 WL 12613271
  (D.S.C. Oct. 28, 2014) ............................................................... 45-46

*Hitachi Electronic Devices (USA), Inc. v. Platinum Technologies, Inc.*,
  366 S.C. 163, 621 S.E.2d 38 (2005) ......................................... 40

*In re Merritt Dredging Co., Inc.*,
  839 F.2d 203 (4th Cir. 1988) ......................................................41

*In re Trucking Co.*,
  281 N.C. 242, 188 S.E.2d 452 (1972) ........................................23

*Int'l Paper Co. v. Corporex Constructors, Inc.*,
  96 N.C. App. 312, 385 S.E.2d 553 (1989) ..................................24

*Jackson v. Associated Scaffolders & Equip. Co.*,
  152 N.C. App. 687, 568 S.E.2d 666 (2002) ..........................24, 25

*Jourdan v. Boggs/Vaughn Contracting*,
  324 S.C. 309, 476 S.E.2d 708 (Ct. App. 1996) ......................48, 49

*Kline Iron & Steel Co. v. Gray Commc'ns Consultants, Inc.*,
  715 F. Supp. 135 (D.S.C. 1989) ......................................30, 34 ,36

*LaVay Corp. v. Dominion Federal Savings & Loan Ass'n*,
  830 F.2d 522 (4th Cir. 1987) ......................................................18

*Lister v. NationsBank of Delaware, N.A.*,
  329 S.C. 133, 494 S.E.2d 449 (SC. App. 1997) .........................42

*Livingston v. Atl. Coast Line R. Co.*,
  176 S.C. 385, 180 S.E. 343 (1935) ..................................19, 21, 41

*McCoy v. Greenwave Enterprises, Inc.*,
  408 S.C. 355, 759 S.E.2d 136 (2014) ..................................47, 49

*McDaniel v. McDaniel,*
    243 S.C. 286, 133 S.E.2d 809 (1963) ..........................................................42

*Menezes v. WL Ross & Co., LLC,*
    403 S.C. 522, 744 S.E.2d 178 (2013) ..........................................................42

*Miller Brewing Co. v. Morgan Mech. Contractors, Inc.,*
    90 N.C. App. 310, 368 S.E.2d 438 (1988) ......................................23, 24, 25

*Myelle v. Am. Cyanamid Co.,*
    57 F.3d 411 (4th Cir. 1995) .........................................................................18

*Myrtle Beach Pipeline Corp. v. Emerson Elec. Co.,*
    843 F. Supp. 1027 (D.S.C. 1993) ................................................................40

*Nash v. Tindall Corp.,*
    650 S.E.2d 81 (S.C. Ct. App. 2007) ............................................................45

*Nationwide Mut. Ins. Co. v. Rhoden,*
    398 S.C. 393, 728 S.E.2d 477 (2012) ..........................................................44

*O'Briant v. Daniel Const. Co.,*
    279 S.C. 254, 305 S.E.2d 241 (1983) ..........................................................20

*Plantation Shutter Co. v. Ezell,*
    328 S.C. 475, 492 S.E.2d 404 (S.C. Ct. App. 1997) .......................28, 30, 33

*Pride v. S. Bell Tel & Tel. Co.,*
    244 S.C. 615, 138 S.E.2d 155 (1964) ..........................................................45

*Princes Cruises, Inc. v. General Electric,*
    143 F.3d 828 (4th Cir. 1998) .......................................................................38

*Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.,*
    296 F.3d 308 (4th Cir. 2002) .......................................................................43

*Ranger Constr. Co. v. Dixie Floor Co.,*
    433 F. Supp. 442 (D.S.C. 1977) ................................................28, 30, 35, 36

*Rauton v. Pullman Co.*,
    183 S.C. 495, 191 S.E. 416 (1937) ...............................................44

*RMS Tech., Inc., v. TDY Indus., Inc.*,
    64 F. App'x 853 (4th Cir. 2003) .................................................35

*State v. Martin*,
    7 N.C. App. 532, 173 S.E.2d 47 (1970) ......................................23

*Stoneledge at Lake Keowee Owners' Ass'n, Inc. v. Clear View Const., LLC*,
    413 S.C. 615, 776 S.E.2d 426 (Ct. App. 2015) ......................49, 50

*Stuck v. Pioneer Logging Mach., Inc.*,
    279 S.C. 22, 301 S.E.2d 552 (1983) ......................................46, 49

*Toomer v. Norfolk S. Ry. Co.*,
    344 S.C. 486, 544 S.E.2d 634 (Ct. App. 2001) ......................47, 48

*Trident Constr. Co. v. Austin Co.*,
    272 F. Supp. 2d 566 (D.S.C. 2003) .............................................31

*Wellin v. Wellin*,
    211 F. Supp. 3d 793 (D.S.C. 2016) .............................................43

*Williams v. Professional Transp. Inc.*,
    294 F.3d 607 (4th Cir. 2002) ......................................................51

*Winnsboro v. Wiedeman–Singleton, Inc.*,
    307 S.C. 128, 414 S.E.2d 118 (1992) ..............................47, 50, 51

*Witt v. Am. Tr. Ass'ns, Inc.*,
    860 F. Supp. 295 (D.S.C. 1994) ............................................19, 21

**Statutes:**

28 U.S.C. § 1406(a) ..................................................................13, 16, 18

N.C. Gen. Stat. § 22B-1 ....................................................*passim*

N.C. Gen. Stat. § 22B-2 ...................................................................46

S.C. Code § 32-2-10 .......................................................................39

S.C. Code § 36-1-103(b) .................................................................40

S.C. Code § 36-1-301 ......................................................................27

S.C. Code § 36-1-301(b) .................................................................39

S.C. Code. § 36-2-314 .....................................................................41

Va. Code § 54.1-1100 ........................................................................4

**Rules:**

Fed. R. Civ. P. 30(b)(6) ....................................................................5

**Other Authorities:**

*Black's Law Dictionary* (10th ed. 2014).........................................23

http://www.amsteelblue.com/amsteel-blue-5-16-synthetic-rope-by-the-foot-
12-300-lbs/. .................................................................................37

http://www.e-rigging.com/half-inch-x-500-foot-iwrc-galvanized-wire-rope. .........37

http://www.gilmorekramer.com/more_info/series_4ws_worm_spur_gear_po
wer_winches/series_4ws_worm_spur_gear_power_winches.shtml. ..................37

http://www.uscargocontrol.com/...................................................37

Restatement (First) of Conflict of Laws § 332 (1934) ...................42, 43

Restatement (Second) of Conflict of Laws....................................42, 43

*Webster's New World College Dictionary* (5th ed. 2010)...................23

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.     Whether the district court properly granted summary judgment to Young Life on Inner Quest's contractual indemnity claim where it is undisputed that the contract was formed in North Carolina, where the applicable choice of law rule was *lex loci contractu*, and where it is undisputed that North Carolina law renders the contract's indemnity provision void and unenforceable?

2.     Whether the district court properly granted summary judgment to Young Life on Inner Quest's equitable indemnity claim where the requisite special relationship necessary to sustain such a claim did not exist because Young Life's alleged negligence was not directed at Inner Quest, and did not flow through Inner Quest to the injured third party?

## STATEMENT OF THE CASE

### A.     Overview

This case arises out of a tragic accident that occurred in July 2015 while campers were participating in a challenge course activity at a Young Life camp called Carolina Point.  The accident occurred when a teenage girl, Olivia Grimes, fell over 100 feet from a giant three-person swing nicknamed the "Freebird" and was fatally injured.  Pursuant to a contract with Young Life, appellant Inner Quest, Inc. ("Inner Quest") designed, constructed and installed the swing.   Adventure Experiences, Inc. ("Adventure Experiences") trained and certified the swing operator.  Young Life operated the swing.

Olivia Grimes' estate asserted various negligence and other claims against Young Life, Adventure Experiences and Inner Quest. Inner Quest asserted a crossclaim against Young Life for contractual indemnity and an alternative crossclaim for equitable indemnity.

After fact discovery, Young Life and Inner Quest filed cross motions for summary judgment with respect to Inner Quest's crossclaims. The district court granted Young Life's motion and denied Inner Quest's. After the district court also denied Inner Quest's motion for reconsideration, Inner Quest filed this appeal.

**B.    Statement of the Facts**

1.    <u>Young Life's Carolina Point Camp Decides to Build a Giant Swing and Wants to Ensure it is Constructed to Specific Safety Standards</u>

Young Life is a non-profit organization whose mission is to introduce adolescents to Jesus Christ and to help them grown in their faith. JA 202-207; 416-417. In furtherance of this mission, Young Life operates numerous camps across the country that are attended by campers primarily in their teens. At these camps, Young Life provides a range of experiences for its campers that are designed to further Young Life's mission. Among those experiences are opportunities to participate in various challenge course activities, such as elevated ropes courses, climbing walls, zip lines and giant swings. It is Young Life's philosophy that challenge course experiences shared between campers and their Young Life leaders help to bridge

gaps between them, help leaders "win the right to be heard," and provide multiple object lessons for leaders to use with campers in the presentation of the gospel. JA 416-417.

Carolina Point began operating in the summer of 2013. In its first few years of operation, Carolina Point only had a two challenge course elements. In early 2015, Young Life decided to build a giant swing to be operated as a third challenge course element at the camp. JA 212, 215.

Young Life was familiar with the typical design of giant swings because it operated such swings at some of its other camps. JA 215, 344. Young Life also knew that it could purchase all components of a giant swing, including even the extremely large support poles, from any number of suppliers and that it could hire most any licensed contractor to use those materials to construct the swing. JA 344-45. Young Life, however, wanted to ensure that the giant swing was designed, constructed and installed to meet the standards established by the Association for Challenge Course Technology ("ACCT"). Young Life viewed the ACCT as "the most-recognized industry leader in standardization of challenge course elements" and thus viewed the ACCT standards as the "litmus test" of challenge course safety credentialing. JA 342, 345. Young Life, therefore, reached out to ACCT member Inner Quest to discuss the possibility of Inner Quest constructing the giant swing to those standards.

3

2.    Inner Quest

Inner Quest has been a Professional Vendor Member of the ACCT since 1993, and it specializes in constructing and operating challenge courses. JA 303, 336-339. Inner Quest is organized into two distinct divisions. The first division "is responsible for design, installation, training, [and] inspection services vended to owners and operators of challenge courses." JA 337-338. The second division "operate[s an] adventure-based challenge course and other adventure-based programming… on contract for schools and other businesses." JA 338. In short, this second division provides challenge course experiences to participants who come to Inner Quest's challenge course. *Id.*

In order to be able to perform the construction work necessary to build massive challenge course elements, such as giant swings, ropes courses and zip lines, Inner Quest holds a Virginia Class B contractor's license, a fact that Inner Quest touted to Young Life. JA 303. As the holder of this Class B license, Inner Quest can perform construction projects as great as $120,000 in value. Va. Code § 54.1-1100.

3.    Young Life and Inner Quest Discuss the Construction Project

In January, 2015 Young Life's Brian Johnson contacted Inner Quest's Randy Smith about the prospect of Inner Quest designing, constructing and installing a giant swing at Carolina Point. JA 217. Smith subsequently provided Johnson a layout sketch of an Inner Quest-designed three-person giant swing. JA 217-221.

4

Smith also told Johnson that he was working on a price quote. JA 221. A few days later, on January 19, 2015, Smith emailed Johnson a proposal for construction of the giant swing, including an estimated price quote for the swing's component parts and for its construction and installation. JA 217-221. The price estimate totaled over $36,000, but Smith indicated that the price quote might change. JA 220.

On February 22, 2015, Johnson wrote to Smith and requested that Smith send him a "finished contract." JA 217, 222. Later that day, Smith emailed an unsigned version of the contract to Johnson. JA 218, 223-229.[1] The document's first page contained an express instruction directing Young Life to sign and return the contract if Young Life agreed to the terms provided therein. JA 224, 249, 301. Additionally, Inner Quest specifically listed Carolina Point's Brevard, North Carolina address on the very first page of the contract.[2] JA 301.

_____

[1] Young Life acknowledges that the unsigned version of the contract located at JA 224-29 is redacted. Young Life assures the Court, however, that all terms of the unsigned contract are identical to the terms of the signed contract located at JA 301-06, as Inner Quest's Rule 30(b)(6) designee admitted. JA 249-250.

[2] Carolina Point straddles the border of North and South Carolina. A portion of the camp sits in Brevard, Transylvania County, North Carolina while another portion sits in Pickens County, South Carolina. Carolina Point's business office is located in the Transylvania County, North Carolina portion of the camp. JA 218. The swing was constructed in the Pickens County portion of the camp.

### 4.    Contract Formation in North Carolina

On February 23, Johnson and his boss reviewed the unsigned version of the contract that Smith provided. JA 218.  They did so while in Carolina Point's office in Brevard (Transylvania County), North Carolina. *Id.*  Accepting all of Inner Quest's proposed terms, and without altering the contract in any way, Johnson signed the contract while he was in Carolina Point's office in Brevard, North Carolina.  *Id.*; JA 249-250.  A few days later, and from that same location in North Carolina, Johnson emailed the signed contract back to Smith.  JA 218.  When doing so, Johnson informed Smith that Young Life had already issued its first contract payment of $18,300 to Inner Quest.  JA 218, 230.  When Smith received the contract signed by Johnson, he understood that the contract had been formed and that Inner Quest could therefore begin ordering parts for the giant swing.  JA 250.  Neither Smith nor anyone from Inner Quest signed the contract after Johnson did; it bears only Johnson's signature. JA 301.

### 5.    The Contract's Terms

As was discussed above, Young Life approached Inner Quest about constructing the giant swing because Young Life wanted the swing built to ACCT standards.  Ultimately, Young Life elected to contract with Inner because Young Life "believed that [Inner Quest] had the expertise in constructing these types of equipment," JA 313, and because Young Life believed "Inner Quest's construction

would meet or exceed the standards set by ACCT." JA 345.[3]  Thus, as one would

expect, the contract between Inner Quest and Young Life specifically provided that

Inner Quest would construct the swing in accordance with all applicable ACCT

standards:

> INNER QUEST Challenge Course General Specifications –
> *Construction*
> *All course construction and ancillary gear meets or exceeds the current*
> *standards set by the Association for Challenge Course Technology.*
> [Followed by a long list of construction specifications].

JA 306 (italicized emphasis added; underlining in original).

> *CONSTRUCTION DETAILS* – *INNER QUEST Challenge Courses are*
> *built in accordance to the Standards published by the Association for*
> *Challenge Course Technology* and [Inner Quest] has been a
> Professional Vendor Member since 1993.

JA 303 (italicized emphasis added; underlining in original).

Moreover, as one might further expect, the contract contained numerous

provisions clearly indicating that the subject of the contract is a construction project.

Although these provisions are set out more fully at pages 31 to 33, *infra*, the contract:

- indicates that Inner Quest "will construct the Challenge Course…"
  (JA 301);

---

[3] Young Life knew that Adventure Experiences, another ACCT Professional Vendor
Member (JA 417), also was capable of constructing challenge course elements,
including giant swings, in conformance with ACCT standards. JA 313-314.  Because,
however, Inner Quest was proposing to construct the giant swing at Carolina Point for
a lower cost, Young Life chose Inner Quest. JA 314.

- lists the "APPROXIMATE CONSTRUCTION DATE(S)" (JA 301);

- explains what is required before "schedul[ing] construction" (JA 301, 304);

- indicates that a "one day pre-construction site visit is included" in the contract price (JA 302);

- explains that "property lines should be clearly marked prior to construction" (JA 303);

- describes what must be done to clear access to the "construction site" in order "to facilitate construction" (JA 303);

- touts the fact that INNER QUEST possesses a contractor's license (JA 303);

- requires Young life to purchase insurance "to cover the entire structure(s) on which this contract is to be done to one hundred percent of the insurable value, including labor and materials" (JA 304); and

- explains that Young Life will be responsible for the costs of "building… permits or inspections [and] site-specific engineering" (JA 302).

In addition to detailing the construction services Inner Quest would provide to Young Life, the contract also detailed the "*CONSULTING SERVICES*" Inner Quest would provide prior to construction of the giant swing. This included a "site survey" and a "telephone consultation" to refine the design proposals of the giant swing. JA 304.

8

The contract did not have a fixed price. Rather, the price could vary depending on how much work Inner Quest had to do to complete the project. So, although the first page of the contract states that the "TOTAL COST" was $36,650, the contract later clarified that that figure was merely an "Estimated Total." JA 301, 302. Thus, the contract listed "Possible Price Adjustments." JA 302. For example, if Young Life arranged to install the giant swing's guy anchors and to dig the holes for the large support poles, the contract price would be reduced by $1,800. JA 302. The price would be reduced by another $800 if Young Life supplied the guy anchors. *Id*. The cost of the contract also could decrease if Inner Quest could find a less expensive vendor for the support poles. JA 220.[4]

Certain factors also could drive the cost up. For instance, the contract expressly stated that the cost of support pole installation was merely a "best estimate" and that "[n]o guarantee can be made regarding pole installation pricing." *Id*. So, if support pole installation took more work than anticipated, Young Life would have to pay more. *Id*. The contract also warned that the cost could further increase if soil and rock conditions caused construction delays. *Id*.

---

[4] Inner Quest's January 19, 2015 email proposal located at JA 220 was made part of the contract. JA 301.

6.    Inner Quest's Pre-Construction Consulting and its Construction of the Giant Swing

Before Inner Quest began constructing the giant swing, Randy Smith conducted a "site survey" as part of the "*CONSULTING SERVICES*" promised in the contract.  JA 222-23, 304.  Thereafter, Smith provided further consulting services, giving Brian Johnson advice on such issues as the location and positioning of the giant swing, the proper materials needed to anchor the swing, how and where to install the anchors and the equipment needed to install those anchors. JA 348-86.

Then, carrying out its self-described role as "contractor and installer of the Freebird," JA 253, Inner Quest constructed the giant swing in April 2015.  Three Inner Quest employees participated in assembling and installing the swing's various component parts over a four-day period.  JA 253-254.  As the contract required, Inner Quest installed two main 85 foot tall support poles, which were set in the ground and anchored with steel guy wires. JA 302, 345.  This required the use of a flatbed truck and a crane to transport and lift the massive support poles.  JA 253-254, 277.   After installation, these support poles were to produce a swing height of approximately 74 feet.  JA 302.

As the contract also required, Inner Quest's construction work involved assembling and installing various other components of the swing, which, like the

large support poles, all were manufactured by third parties.[5]  JA 243, 253-254, 306, 345-346.  For instance, Inner Quest installed the moving parts of the swing, which consisted of several steel cables suspended from the 85 foot tall support poles, along with a steel crossbar connected to those cables. JA 306, 254, 345-346.  Inner Quest's construction work also included installing a Thern winch used to hoist riders high into the air at the start of the swing's operation.[6] JA 220, 302.

Inner Quest completed construction of the giant swing on April 9, 2015. JA 219, 253.  Five days later, Inner Quest invoiced Young Life for the balance owed under the contract.  JA 219, 237.  The final balance reflected that Inner Quest charged Young Life for its employees' meals consumed during the days of construction and for supplying the scaffolding used during construction. JA 237.  The final price was lower than the original $36,650 estimate, however, because Young Life received a $2,600 discount for providing and installing the guy anchors and for directly supplying the equipment used to dig the holes for the utility poles. *Id.*  In total, Young Life paid Inner Quest $34,829 to construct the swing. *Id*.

---

[5] As Inner Quest has admitted, "the components of the Freebird were made by entities other than Inner Quest." JA 243.

[6] The manufacturers of the large support poles and the Thern winch shipped those materials directly to the job site at Carolina Point. JA 280, 344.

### 7.    Inner Quest's Design of the Giant Swing's Passenger Restraint

Inner Quest designed the swing. JA 221, 329, 331.  Because of the swing's very large size and the height to which riders were hoisted prior to the swing's release, riders reached high speeds and high heights during swing operation.  Riders thus needed to be attached to the swing for safety.  Although each rider sat in a swing seat that resembled a traditional playground swing seat, that served solely to aid rider comfort; it did not serve as a rider restraint.  Instead, Inner Quest designed the Freebird so that riders would be attached to the swing's crossbar by wearing a body harness with a single carabiner that connected through a steel loop welded to the crossbar. JA 241-244, 247, 283.  The carabiner served as the Freebird's "singular passenger restraint component," JA 247, a design feature that ultimately became the central focus of the Grimes' estate's claims against Inner Quest.

### 8.    Olivia Grimes' Accident

After Inner Quest completed construction of the giant swing in April 2015, Adventure Experiences trained and certified Young Life employees to operate it.  JA 312, 315.  Young Life then began operating the giant swing in May 2015.  JA 219.

On July 13, 2015, Olivia Grimes was a camper at Carolina Point.  She and two other campers were taking their turn riding the Freebird.  A Young Life employee whom Adventure Experiences had trained and certified to operate the Freebird was operating it at this time.  For reasons unknown, when the swing was

retracted rearward by the electric winch, Olivia's carabiner was not connected to the steel loop attachment point on the crossbar. After the swing was released and began its forward travel, Olivia was thrown from the swing. She fell more than 100 feet to the ground and was fatally injured.

### C.    Procedural Background and Disposition in the District Court

#### 1.    The Grimes Lawsuit, Transfer to the District of South Carolina Under 28 U.S.C. § 1406(a) and the Addition of Inner Quest as a Defendant

Olivia Grimes' estate originally sued just Young Life and Adventure Experiences. The Grimes estate filed that initial action in state court in Florida. JA 73-87. Young Life removed the case to the Middle District of Florida on the basis of diversity jurisdiction. JA 18-21. Subsequently, the Middle District of Florida transferred the case to the District of South Carolina pursuant to 28 U.S.C. § 1406(a). JA 89-97. After the transfer, the Grimes estate amended the complaint, adding Inner Quest as a defendant. Subsequently, the Grimes estate filed a second amended complaint further detailing its claims against all three defendants. JA 98-141.

In the second amended complaint, the estate alleged that Young Life failed to properly attach Olivia to the swing, failed to recognize that the swing was unreasonably dangerous in that it relied on a single point of attachment, failed to double check the riders' attachments and failed to properly train the swing operators. JA 105-106. As to Inner Quest, the estate alleged that Inner Quest's design of the

Freebird was unreasonably dangerous because it relied on a single attachment point that failed to eliminate or greatly diminish rider fall risk by the use of multiple and passive rider attachment systems, that Inner Quest failed to develop adequate safety procedures to operate the Freebird including the use of a two-person double check of the single point of attachment, and that Inner Quest failed to warn Young Life that the swing, having only a single attachment point, was unreasonably dangerous. JA 116-117. As regards Adventure Experiences, the estate alleged that it failed to train Young Life's swing operators adequately and that it failed to develop safe operational procedures for use of the swing. JA 126-127.

### 2.    Inner Quest's Crossclaim

Shortly after being served with plaintiff's first amended complaint, Inner Quest tendered the defense of the claims asserted against it to Young Life. JA 285-286. Inner Quest based its tender on contract language that purports to indemnify Inner Quest for any claim, however caused, even if that claim arises in part from Inner Quest's own negligence. JA 285-286, 302. Inner Quest expressly stated that it was attempting to enforce the indemnification provision "under North Carolina law." JA 285. Because N.C. Gen. Stat. § 22B-1 renders the indemnity provision void and unenforceable, Young Life rejected Inner Quest's tender. JA 297-298. Inner Quest thereafter asserted its crossclaims against Young

Life. JA 188-189.[7]  Young Life denied all material allegations of the crossclaims.

JA 190-191.

### 3.    Summary Judgment Motions, the District Court's Rulings and Inner Quest's Appeal

Following fact discovery, Young Life moved for summary judgment on

Inner Quest's crossclaims. JA 193-194.  In response, Inner Quest filed a cross

motion for summary judgment on those same crossclaims.  JA 299.  Applying

South Carolina's *lex loci contractu* doctrine, the district court held that North

Carolina law governed Inner Quest's contractual indemnity claim because the

contract was formed in North Carolina.  The district court then held that the

contractual indemnity provision on which Inner Quest relied was void and

unenforceable under N.C. Gen. Stat. § 22B-1. JA 401-414.  As to Inner Quest's

alternative claim for equitable indemnity, the district court, applying South

Carolina law, found that the requisite special relationship needed to sustain an

equitable indemnity claim did not exist between Inner Quest and Young Life

because Young Life's alleged negligence did not flow through Inner Quest.  JA

413.  Accordingly, held the district court, Inner Quest's alternative claim failed as

---

[7] As indicated, Inner Quest initially asserted its crossclaims in response to the first amended complaint.  After the Grimes estate filed its second amended complaint, Inner Quest restated the same crossclaims, verbatim, in its answer to that second amended complaint.  The Joint Appendix contains only Inner Quest's restated crossclaims.  JA 188-189.

a matter of law.  The district court thus granted Young Life's summary judgment motion and denied Inner Quest's. *Id*.

Inner Quest moved for reconsideration. JA 421-425.  The district court denied that motion. JA 426-428.  Inner Quest then filed its notice of appeal challenging all of the above described rulings of the district court.

## SUMMARY OF THE ARGUMENT

Because this case was transferred to the United States District Court for the District of South Carolina pursuant to 28 U.S.C. § 1406(a), South Carolina's choice of law rules apply to this dispute.  South Carolina's well-established choice of law rule of *lex loci contractu* demands that contracts are interpreted and enforced under the law of the state where the contract was formed.  Because the contract between Young Life and Inner Quest was formed in North Carolina, North Carolina law governs the interpretation and enforceability of its contractual indemnity provision.  According to N.C. Gen. Stat. § 22B-1's plain language and the North Carolina courts' interpretation of that statute, the contractual indemnity provision is void and unenforceable as a matter of law because it purports to indemnify Inner Quest for its own negligence.

Contrary to Inner Quest's assertions, South Carolina's UCC choice of law provision does not apply because the contract at issue is predominantly for construction services, not for the sale of a good.  This is evident for several reasons.

16

First of all, Young Life engaged Inner Quest expressly to construct a giant swing in accordance with the specialized ACCT standards, and Inner Quest agreed to use its expertise to construct the swing according to those standards.  In addition, the clear language of the contract indicates that Inner Quest would provide construction services and other services to complete the construction project.  Thus, Inner Quest's assertion that it did not contract to provide services, but rather to sell a finished product, is belied by the express language of the contract.  Finally, Inner Quest admitted in discovery that it is a service company, not a seller of goods.  All of these indicia support the district court's holding that the contract is predominantly one for services and, further, that South Carolina's UCC choice of law rule does not apply.  Accordingly, under the *lex loci contractu* doctrine, North Carolina law governs the contract.

Moreover, no public policy rationale recognized by South Carolina courts requires this Court to refuse to enforce N.C. Gen. Stat. § 22B-1.  The district court, therefore, did not err by granting summary judgment to Young Life, and by denying summary judgment to Inner Quest, with respect to Inner Quest's crossclaim for contractual indemnity.

The district court also properly granted summary judgment in favor of Young Life with respect to Inner Quest's crossclaim for equitable indemnity.  That crossclaim failed as a matter of law because the contractual relationship between

Young Life and Inner Quest does not constitute the special relationship required to sustain an equitable indemnity claim. Rather, for such that relationship to exist under South Carolina law, Young Life's alleged negligence had to have been directed at Inner Quest – had to have flowed through Inner Quest to the injured third party – which unquestionably did not occur.

## ARGUMENT

I. **North Carolina Law Governs Inner Quest's Contractual Indemnity Claim, and N.C. Gen. Stat. § 22B-1 Renders the Contract's Indemnity Provision Void and Unenforceable**

A. **North Carolina Law Governs Inner Quest's Contractual Indemnity Claim**

i. South Carolina's Choice of Law Rules Apply

A transferee court that receives a case pursuant to 28 U.S.C. § 1406(a) must apply the choice of law rules of the state in which the transferee court sits. *Myelle v. Am. Cyanamid Co.*, 57 F.3d 411, 413 (4th Cir. 1995); *LaVay Corp. v. Dominion Federal Savings & Loan Ass'n,* 830 F.2d 522, 526 (4th Cir. 1987). Because the United States District Court for the Middle District of Florida transferred this case to the District of South Carolina pursuant to § 1406(a), the district court properly applied South Carolina's choice of law rules. JA 405.

ii.    <u>Because the Contract Was Formed in North Carolina, South
Carolina's Well-established *Lex Loci Contractu* Choice of Law
Rule Requires Application of North Carolina Law to Issues
Concerning the Interpretation and Enforcement of the Contract</u>

South Carolina has long adhered to the doctrine of *lexi loci contractu*, which

holds that the jurisdiction in which the contract is formed governs the interpretation and

enforcement of the contract. *Livingston v. Atl. Coast Line R. Co.*, 176 S.C. 385, 180

S.E. 343, 345 (1935).

> It is fundamental that unless there be something intrinsic in, or extrinsic
> of, the contract that another place of enforcement was intended, the lex
> loci contractu governs.  If the contract be silent thereabout, the
> presumption is that the law governing the enforcement is the law of the
> place where the contract is made.

*Id.*[8]  *See also Witt v. Am. Tr. Ass'ns, Inc.*, 860 F. Supp. 295, 300 (D.S.C. 1994) ("In

contract actions, South Carolina courts apply the substantive law of the place where

the contract at issue was formed."); *Georgia Bank & Tr. Co. of Augusta v. Trenery*,

Jr., No. CIV.A. 3:08-2371-JFA, 2010 WL 3271732, at *2 (D.S.C. Aug. 18, 2010)

(unpublished) ("South Carolina follows the doctrine of lex loci contractu in

interpreting and giving effect to contracts.").

When a written offer is extended, the contract is accepted and formed by the

offeree's signature.  *Askins v. Firedoor Corp.*, 281 S.C. 611, 616, n.3, 316 S.E.2d

713, 716, n.3 (1984) ("A contract is executed when the last act necessary for its

---

[8] The contract between Inner Quest and Young Life does not contain any choice of law
provision. JA 301-306.

formation is done and at the place where the final act is done."). Therefore, when an offeree accepts a written offer by signing off on all of its terms, the contract is formed in the location where the offeree signs. *See, e.g.*, *Eagle Aviation, Inc. v. Galin*, 761 F. Supp. 405, 407 (D.S.C. 1989) (where an offer letter and form contract were delivered to defendant in Connecticut, and the offer letter was signed in Connecticut, "any contract arising therefrom was entered into in Connecticut"); *Aviation Associates & Consultants, Inc. v. Jet Time, Inc.*, 303 S.C. 502, 506, 402 S.E.2d 177, 179 (1991) ("[T]he contract was entered into when [the offeree] accepted the offer in Oklahoma by signing the letter."); *O'Briant v. Daniel Const. Co.*, 279 S.C. 254, 256, 305 S.E.2d 241, 243 (1983) (a contract is formed in the place "where the minds of the parties meet or the place where the final act occurred which made a binding contract").

Unquestionably, the contract between Inner Quest and Young Life was formed in North Carolina. Inner Quest does not even attempt to argue otherwise, nor could it, as the undisputed facts show.

After Randy Smith and Brian Johnson discussed the work Young Life wanted Inner Quest to perform and after Smith provided an estimated price quote, Johnson asked Smith to provide a "finished contract." JA 217, 222. This request for a finished contract was a request for Inner Quest to commit to writing all the terms by which it would agree to be bound. In other words, it was a request for a final offer.

20

Inner Quest provided that final offer on February 22.  JA 218, 249-250.  Young Life

accepted all of Inner Quest's terms without making a single modification, then

Johnson signed the document while in his office in Brevard, North Carolina, as Inner

Quest concedes.  JA 218, 249-250; IQ Br. at 4, 27.   He returned it to Smith, also

from his North Carolina office, and informed Smith that Young Life had issued the

first contract payment to Inner Quest.  JA 218.  Upon receipt of Johnson's signature

on the document, Smith understood that a contract had been formed, such that he

could proceed to order equipment needed to construct the swing. JA 249-250.

Because the final act which made the contract a binding agreement –

Johnson's acceptance of all terms contained in Inner Quest's offer – occurred in

North Carolina, the contract was formed in North Carolina.  South Carolina's *lex*

*loci contractu* choice of law rule thus mandates that North Carolina law be applied

to issues concerning the validity and enforceability of the contract terms.  *Livingston*,

176 S.C. 385, 180 S.E. at 345; *Witt*, 860 F. Supp. at 300.  Indeed, Inner Quest

conceded this point in its letter tendering the defense to Young Life.  *See* JA 285

(claiming a right to enforce the indemnity provision "under North Carolina law.").[9]

---

[9] Inner Quest's present contention that contract formation in North Carolina was merely
a "quirk" (IQ Br. at 27, 31) is not only irrelevant, but also is belied by the fact that Inner
Quest unquestionably knew it was dealing with an entity whose business office was in
North Carolina, which is why Inner Quest wrote Carolina Point's North Carolina
address on the very first page of the contract. JA 301.

**B.     North Carolina General Statute § 22B-1 Renders the Contract's Indemnity Provision Void and Unenforceable Because it Purports to Indemnify Inner Quest for its Own Negligence**

North Carolina General Statute § 22B-1 voids and renders unenforceable contractual indemnity provisions in design and construction contracts that purport to indemnify a contracting party for damages arising even just partially out of its own negligence. The statute provides in relevant part:

> Any promise or agreement in, or in connection with, a contract or agreement relative to the design, planning, construction, alteration, repair or maintenance of a building, structure, highway, road, appurtenance or appliance . . . purporting to indemnify or hold harmless the promisee . . . against liability for damages arising out of bodily injury to persons or damage to property proximately caused by or resulting from the negligence, in whole or in part, of the promisee, . . . is against public policy and is void and unenforceable.

N.C. Gen. Stat. § 22B-1.

This statute unquestionably applies to the contract between Inner Quest and Young Life. The contract is "a contract… relative to the design, planning, construction… of a… structure,… appurtenance or appliance…." It is undisputed that Inner Quest designed the swing that it constructed for Young Life. JA 221, 329, 331. Inner Quest also planned the swing construction and constructed it, as the contract required it to do. The contract expressly states that Inner Quest was to "construct the Challenge Course" described in Smith's January 19 email proposal to Johnson. JA 301. Moreover, in multiple other ways, the contract described, quite

accurately, the project being performed as a construction project.  *See* pp. 7 to 8, *supra* and pp. 31 to 33, *infra*.  Inner Quest performed this construction project over a four-day period in April 2015, assembling all of the various component parts of the swing, and setting and anchoring the giant 85 foot poles into the ground.

It is also clear that the Freebird is a "structure,… appurtenance or appliance…."  Although § 22B-1 does not define those terms, "'the [North Carolina] Legislature is presumed to have used the words of [the] statute to convey [its] natural and ordinary meaning.'" *Miller Brewing Co. v. Morgan Mech. Contractors, Inc.*, 90 N.C. App. 310, 315, 368 S.E.2d 438, 441 (1988) (*quoting In re Trucking Co.*, 281 N.C. 242, 252, 188 S.E.2d 452, 458 (1972)).  Thus, "for guidance, 'courts may, and often do, resort to dictionaries for assistance in determining the common and ordinary meaning of words and phrases.'" *Id.* (*quoting State v. Martin*, 7 N.C. App. 532, 533, 173 S.E.2d 47, 48 (1970)).  "Structure" is defined as "[a]ny construction, production, or piece of work artificially built up or composed of parts purposefully joined together." *Black's Law Dictionary* (10th ed. 2014).  *Webster's New World College Dictionary* (5th ed. 2010) defines "appurtenance" to mean "apparatus or equipment."  "Appliance" is defined, among other things, as a "device specially designed for a particular use." *Miller Brewing*, 90 N.C. App. at 316, 368 S.E.2d at 441.  The Freebird plainly was all of these things.

Moreover, North Carolina case law makes it clear that § 22B-1 applies to contracts that are relative to the design or construction of all manner of structures, appurtenances and appliances. For instance, in *Miller Brewing*, 90 N.C. App. at 312, 368 S.E.2d at 439, the court held that § 22B-1 applied to a contract for the assembly and installation of a forty-foot conveyor system. And, in *Jackson v. Associated Scaffolders & Equip. Co.*, 152 N.C. App. 687, 688, 568 S.E.2d 666, 666 (2002), the court held that the statute governed a contract to erect a scaffold that was to be used to install an exhaust system in an already existing building.

It is thus beyond legitimate dispute that §22B-1 applies to the contract between Inner Quest and Young Life. It is equally beyond dispute that the statute renders the indemnity provision on which Inner Quest relies void and unenforceable, as is discussed next.

The plain language of § 22B-1 indicates that indemnity provisions in construction contracts that purport to indemnify the promissee for damages proximately caused by or resulting "in whole or in part" from the promisee's own negligence are void and unenforceable. Thus, "any provision seeking to indemnify the promisee from its own negligence is void." *Bridgestone/Firestone, Inc. v. Ogden Plant Maint. Co. of N. Carolina*, 144 N.C. App. 503, 506, 548 S.E.2d 807, 810 (2001). Put another way, § 22B-1 voids "those construction indemnity provisions which attempt to hold one party responsible for the negligence of another." *Int'l*

24

*Paper Co. v. Corporex Constructors, Inc.*, 96 N.C. App. 312, 315, 385 S.E.2d 553, 555 (1989).

North Carolina's courts have repeatedly voided contractual provisions with language purporting to require the promisor to indemnify the promisee for the promisee's own negligence. For instance, in *Miller Brewing*, 90 N.C. App. at 313, 368 S.E.2d at 439, the court voided an indemnity provision that purported to require the promisor "to save harmless and indemnify [the promisee] from any and all judgments, costs, expenses, including attorneys' fees, and claims . . . arising out of or in any way connected with the work done or goods furnished under [the agreement]." Similarly, in *Jackson*, the court voided an indemnity provision that would have required the promisor to hold harmless and defend the promisee from all lawsuits or judgments "of any name and description arising out of or incidental to the performance of this contract or work performed thereunder." 152 N.C. App. at 690, 568 S.E.2d at 668.

The indemnity provision at issue here is not materially different from those invalidated in *Miller Brewing* and *Jackson*. It reads as follows:

> The risk of use of the Challenge Course/Climbing Wall and ancillary Equipment, by any person after completion of the service performed by INNER QUEST pursuant to this Contract shall be the sole responsibility of the Client. The Client agrees to release, protect and indemnify (that is, defend and pay, including costs and attorneys [sic] fees) INNER QUEST, its staff, owners and directors from any claim for any loss or injury, including death, however caused, arising in whole or in part from the authorized or unauthorized use of the Challenge

25

> Course/Climbing Wall or Equipment. The only exception to the Client's agreement of release and indemnity is a claim of loss which arises solely (that is, no other factor – human, environmental or otherwise – contributed to such a loss) from a negligent act or omission by INNER QUEST in the performance of its contractual obligations.

JA 302.

This language purports to require Young Life to defend and indemnify Inner Quest "from *any claim* for any loss or injury, including death, *however caused*" arising from use of the giant swing. JA 302 (emphasis added). It provides only one narrow exception. Young Life is relieved of its purported indemnity obligation only if Inner Quest's own and sole negligence — devoid of any other contributing factor — causes a loss. Thus, if Inner Quest's negligence, no matter how slight, combines with anyone else's negligence, the indemnity provision purports to require Young Life to defend and indemnify Inner Quest against its own negligence. The indemnity provision thus runs afoul of § 22B-1. Tellingly, Inner Quest makes no argument to the contrary.

Because N.C. Gen. Stat. § 22B-1 renders the indemnity provision void and unenforceable, Inner Quest's crossclaim for contractual indemnity fails as a matter of law. The district court, therefore, properly granted Young Life's summary judgment motion, and denied Inner Quest's motion, with respect to that claim.

26

## II.     South Carolina's UCC Choice of Law Provision Does Not Apply

Attempting to avoid the clear rule of *lex loci contractu* and the application of N.C. Gen. Stat. § 22B-1, Inner Quest argues that the UCC choice of law provision found in S.C. Code § 36-1-301 should apply instead.  To support this argument, Inner Quest claims it contracted with Young Life to provide "a finished product – the swing….", and thus the contract between Young Life and Inner Quest was predominantly for the sale of a good. IQ Br. at 10.  That contention is belied by Inner Quest's own admission, made during discovery, that it merely was "the seller and supplier of the *components*" of the giant swing, not the seller of a finished product.  JA 253 (emphasis added).  It is further belied by Inner Quest's additional admission that, using the component parts made by others, Inner Quest "served as the contractor and installer" of the swing. *Id*.  Additionally, it is belied by the parties' contracting intent, by the language of the contract itself, and by the other indicia courts consider when determining whether a contract is predominantly for services or for the sale of goods.  These factors dictate the conclusion that the contract is predominantly one for construction services.

### A.     South Carolina's UCC Choice of Law Provision Does Not Apply Because The Contract is Predominantly One for Services

When a mixed contract for the provision of goods and services is at issue, courts must determine whether the contract is primarily one for goods or services

and, therefore, whether the UCC applies to that contract. In making this determination, South Carolina applies the "predominant factor" or "predominant thrust" test originally described in *Bonebrake v. Cox*, 499 F.2d 951 (8th Cir. 1974), and adopted in *Plantation Shutter Co. v. Ezell*, 328 S.C. 475, 492 S.E.2d 404, 406 (S.C. Ct. App. 1997). *See also Ranger Constr. Co. v. Dixie Floor Co.*, 433 F. Supp. 442, 444 (D.S.C. 1977) (applying same test). "Under this test, if the predominant factor of the transaction is the rendition of a service with goods incidentally involved, the UCC is not applicable. If, however, the contract's predominant factor is the sale of goods with labor incidentally involved, the UCC applies." *Plantation Shutter*, 328 S.C. at 478, 492 S.E.2d at 405 (internal citation omitted). When considering this question, courts should attempt to ascertain the contract's "predominant factor, thrust or purpose, reasonably stated." *Ranger*, 433 F.Supp at 444.

Here, it is clear that Young Life's very reason, its very purpose, for contracting with Inner Quest was to obtain Inner Quest's construction services so that Young Life could be assured that the giant swing would be constructed in full compliance with the ACCT's specialized standards. Although it could have obtained the component parts of the giant swing from any number of suppliers and could have hired any number of contractors to construct it, Young Life selected Inner Quest because it "believed that [Inner Quest] had the expertise in constructing these types

of equipment," and because Young Life believed "Inner Quest's construction would meet or exceed the standards set by ACCT." JA 313, 345. For its part, Inner Quest touted its ability to meet that specific demand. JA 303. Moreover, Inner Quest expressly promised to construct the swing in accordance with the ACCT standards. JA 306. Furthermore, Inner Quest expressly admits that it was retained to be "the contractor and installer" of the swing, further evidencing Inner Quest's understanding that it was retained for its construction services. JA 253. Accordingly, it is clear that Inner Quest understood it was being hired to carry out Young Life's specific goal of having the swing constructed to the ACCT's standards. By entering the contract with Young Life, Inner Quest indicated its intent to provide that specialized service.

While this should be sufficient to end the inquiry, Young Life nonetheless addresses below the various indicia that courts examine when trying to ascertain the contract's predominant purpose. As will be seen, consideration of those indicia makes it obvious that the purpose of the contract was to secure Inner Quest's construction services.

In *Coakley & Williams, Inc. v. Shatterproof Glass Corp.*, 706 F.2d 456, 460 (4th Cir. 1983), this Court acknowledged that courts generally have emphasized three indicia when determining the nature of a contract: (1) the language of the contract, (2) the nature of the business of the supplier and (3) the

intrinsic worth of the materials involved. *Id.* These three indicia will be addressed in turn.

<u>The Language of the Contract</u>:

When analyzing the language of a contract to determine whether it is one for services or goods, a court should view the individual terms in the context of the contract as a whole, rather than placing too much emphasis on individual words. *Plantation Shutter*, 328 S.C. at 479, 492 S.E.2d at 406. Generally speaking, however, a contract that describes the parties to that contract as a "buyer" and "seller," or the specific "terms of sale" or good to be sold, is indicative of a contract for the sale of goods. *Plantation Shutter*, 328 S.C. at 479, 492 S.E.2d at 406; *Kline Iron & Steel Co. v. Gray Commc'ns Consultants, Inc.*, 715 F. Supp. 135, 140 (D.S.C. 1989). Conversely, a contract for construction or installation services generally will identify the service provider as a "contractor," and not as a "materialman" or other seller of a product. *Ranger Construction*, 433 F. Supp. at 445; *Coakley & Williams*, 706 F.2d at 461.

Pricing and payment terms also help indicate whether goods or services is the predominant focus of the contract. A "fixed price" or "lump-sum" contract that does not allocate the cost of a particular service can be suggestive of a contract for the sale of goods. *Plantation Shutter*, 328 S.C. at 479, 492 S.E.2d at 406; *Kline*, 715 F. Supp. at 140 (discussing how "fixed price" indicates contract for sale of goods);

*Trident Constr. Co. v. Austin Co.*, 272 F. Supp. 2d 566, 572 (D.S.C. 2003) (discussing how "lump-sum" price indicative of contract for sale of goods). Conversely, of course, a contract with an estimated cost that might change depending on the actual amount of time, labor or equipment needed to perform, is certainly indicative of a contract for services.

The language in the contract between Inner Quest and Young life overwhelmingly indicates that it is a contract for Inner Quest's construction services. First, the contract identifies Young Life as Inner Quest's "client" throughout the contract, not as a "buyer." JA 302-304. Second, Inner Quest identifies itself not as a "seller," but as a "licensed Virginia Class 'B' Contractor." JA 303. Even more telling than these labels, however, is the virtually ubiquitous use of language expressly stating that Inner Quest was to perform construction services:

- "INNER QUEST, Inc. will *construct the Challenge Course*…." JA 301 (emphasis added).

- "*APPROXIMATE CONSTRUCTION DATE(S)*: Spring 2015" JA 301 (emphasis added).

- "We *cannot schedule construction without a contract*." JA 301 (emphasis added).

- "The *project covered by this contract* is described as follows: INNER QUEST will *install* a 3-person Giant Swing…" JA 302 (emphasis added).

31

- "A one day *pre-construction site visit* is included." JA 302 (emphasis added).

- "All property lines should be clearly marked *prior to construction*." JA 303 (emphasis added).

- "The client must provide vehicular access directly to the *construction site(s)*. INNER QUEST's having to provide such access… would result in an increase in *construction costs*." JA 303 (emphasis added).

- "[T]he client is responsible for clearing the activity sites adequately *to facilitate construction*…." JA 303 (emphasis added).

- INNER QUEST will attempt to minimize any damage to the site… *during construction...*" JA 303 (emphasis added).

- "[D]isposal of all *construction debris* is the responsibility of the client." JA 303 (emphasis added).

- "A site survey is not generally necessary *prior to construction* but can be done if necessary for a consulting fee…." JA 304 (emphasis added).

- "<u>SCHEDULING</u> - INNER QUEST is always very busy building courses and conducting training. *No construction can be scheduled without a contract and jobs are added to our schedule, in order,* at the time of receipt of the <u>signed</u> contract. In addition, a 50% deposit is required 60 days *prior to the scheduled construction date* and final payment is due immediately upon *completion of construction*." JA 304 (italicized emphasis added; underlining in original).

32

- "Food and lodging for INNER QUEST staff *during construction*… will be the responsibility of the client." JA 304 (emphasis added).

Moreover, the contract contains other provisions that typically are found only in construction or other service contracts:

- "INNER QUEST, Inc. will receive… *progress payment[s]* [upon delivery to the job site of certain materials and]… The Balance [of the contract price] will be *paid on completion of the project*." JA 301 (emphasis added).

- "[Young Life is responsible for] [a]ny costs required for meeting *local building… permits or inspections to include site specific engineering*…." JA 302.

- "The Client is responsible for purchasing and maintaining liability insurance to protect the Client against claims which may arise from *operations under this project*.  The Client is also responsible for purchasing and maintaining property damage insurance to cover *the entire structure(s) on which this contract is to be done* to one hundred percent of the insurable value, *including labor and materials*." JA 304 JA 304 (emphasis added).[10]

In addition to this language making it clear that the contract is for construction services, the contract did not have a fixed price.  The price could vary depending on how much work Inner Quest had to do to complete the project.  So, although the first

---

[10] Against all of this language, Inner Quest hangs its hat on the fact that the contract twice uses the word "buy." (IQ Br. at 14).  In doing so, Inner Quest ignores the admonition from the Court of Appeals of South Carolina that courts must "look[] at the contract as a whole…." *Plantation Shutter*, 328 S.C. at 479, 492 S.E.2d at 406.

page states that the "TOTAL COST" was $36,650, the contract later clarified that that figure was merely an "Estimated Total." JA 301, 302.  Indeed, the contract immediately thereafter described "Possible Price Adjustments" that all depended on how much time, labor and equipment were needed to complete various construction tasks.  JA 302.

Further, the contract did not have a lump sum price.  Rather, the contract indicated that pre-construction site evaluation would cost $1,500, that all swing components [other than the support poles] "with installation" would cost $21,250, that crane rental would cost an estimated $2,000, and that the support poles with installation would cost $11,900 (unless a less expensive supplier could be located). JA 220.  Those estimated costs all add up to the "ESTIMATED TOTAL" of $36,650.[11] JA 301, 302.

Examined as a whole, the contract between Young Life and Inner Quest is predominantly one for construction services.[12]  Not only are these services described

---

[11] Inner Quest incorrectly claims that it "only provided one price for the final product without itemization between components, design, and assembly or installation." IQ Br. at 11.  Inner Quest ignores the fact that the contract specifically references and incorporates Smiths January 19 "email/proposal" to Johnson, which itemizes the various costs. JA 301, 220.

[12] Likely because Inner Quest incorrectly asserted that the contract only had a lump sum price, Inner Quest places much reliance on *Kline*, 715 F. Supp. at 139.  Inner Quest's reliance on *Kline*, however, is misplaced.  On top of the fact that service costs are, in fact, itemized in the contract between Inner Quest and Young Life, *Kline* is further inapposite since the *Kline* court's determination that the contract at issue there was

in detail throughout the contract, but the terms used to describe the parties, the giant swing itself, and the potentially variable cost all support the fact that this contract is predominantly for services.

The Nature of the Business of the Supplier:

As indicated, the second of the indicia that courts examine is "the nature of the business of the supplier." *Coakley*, 706 F.2d at 460. Thus, in *Ranger*, the fact that the defendant provided floor installation services supported the court's determination that the contract at issue was one for services. 433 F. Supp. at 445. So did the fact that the defendant sourced all of its materials from a third party, indicating that the defendant was "primarily a service-oriented business which deals in materials as an incident to its performance of services." *Id. Cf. RMS Tech., Inc., v. TDY Indus., Inc.*, 64 F. App'x 853, 856 (4th Cir. 2003) (unpublished) (noting that manufacturer of military training system was seller of goods in part because it was "in the business of manufacturing and selling [these] systems using its own materials.").

Inner Quest clearly is a service corporation. Speaking as Inner Quest's Rule 30(b)(6) designee, Randy Smith admitted that Inner Quest has two divisions, both

---

predominantly for the sale of goods hinged not only on the fact that there was a lump sum price, but also on the facts that the contract described a party as a "Buyer," and that the cost of the goods far outweighed the services provided. *Id.* at 140. Such facts are not present here.

of which provide services: one division designs, constructs and installs challenge course elements; the other division operates a challenge course. JA 337-338. Moreover, statements Inner Quest made in the contract confirm that this is the nature of its business.  Indeed, Inner Quest cautioned in the contract that because it is "always very busy building courses and conducting training," construction will not be scheduled before receipt of a signed contract. JA 304.  Of course, Inner Quest also explained in the contract that it is a licensed contractor.  JA 303.  Thus, Inner Quest's own admissions and statements make clear that it is a primarily a provider of services.[13]  Also pointing to that conclusion is the fact that Inner Quest sourced the materials used to construct the swing entirely from third parties instead of assembling its own manufactured products. JA 253. *Ranger*, 433 F. Supp. at 445.

The Intrinsic Value of the Goods and Services Provided:

The last of the indicia courts look at is "the intrinsic worth of the materials involved." *Coakley*, 706 F.2d at 460.  Doing so, courts will compare the cost of the goods to the cost of the services to see if that helps determine which predominates the contract. *See Kline*, 715 F. Supp. at 140.

The subject contract separately itemizes the cost of two services: $1,500 for "[p]re-construction visit for site evaluation"; and an estimated $2,000 for crane

---

[13] Inner Quest's claim in its brief that "a large portion of [its] business is in fact for the sale of goods" is, quite notably, not supported by citation to any evidence. IQ Br. at 13.

rental. JA 220. The contract further states that costs are being charged for installation of the swing components, including the support poles, but those installation costs are not specified. Neither, however, are the costs of any of the component parts, including the poles, specified. Rather, the contract states that the costs for "[a]ll swing components *with installation*" is $21,250, and that "pole cost *and installation*" is $11,900. JA 220, 302. Inner Quest unquestionably knew what it paid for the various swing components and poles, and it knew how much it charged for labor. The fact that Inner Quest chose not to present that evidence to the district court suggests that labor costs exceeded the component part costs.

Young Life submits, as it did before the district court, that publicly available information about the retail cost of the various swing components (other than the support poles) confirms what Inner Quest's failure to produce evidence suggests.[14]

---

[14] As it did below, Young Life refers this Court to JA 345-346, where the various component parts are itemized. And, as it did below, Young Life also sets out publicly available information about the cost of those parts. The retail cost of the electric Thern winch (Model No. 4WS3M10, with a 1,000 pound load rating), and its electronic components is approximately $5,000. *See http://www.gilmorekramer.com/more_info/series_4ws_worm_spur_gear_power_winc hes/series_4ws_worm_spur_gear_power_winches.shtml.* The retail price for 1500 feet of ½" galvanized steel cable is approximately $1,350. *See http://www.e-rigging.com/half-inch-x-500-foot-iwrc-galvanized-wire-rope.* 300 feet of winch cable costs approximately $550. *See http://www.amsteelblue.com/amsteel-blue-5-16-synthetic-rope-by-the-foot-12-300-lbs/.* Many of the other products, such as cable clamps, thimbles and swages retail at inexpensive per unit prices, and add up to no more than $2,000 total. They can be found here: *http://www.uscargocontrol.com/.* These figures show that the cost of these components potentially amounts to less than half of the $21,250 cost listed for swing components with installation.

Absent consideration of this publicly available information, this Court should do what the district court did, and conclude that the intrinsic value of the materials and the labor, being insufficiently known, cannot be said to weigh against the clear conclusion to which the other *Coakley* indicia point, namely, that the parties' contract is for services, not goods.[15]  *See Princes Cruises, Inc. v. General Electric*, 143 F.3d 828, 833-34 (4th Cir. 1998).

In summary, evaluation of the three indicia described in *Coakley & Williams* demonstrates that the contract is predominantly a service contract.  First of all, the contract terms clearly indicate a service contract.  The contract repeatedly describes the construction and consulting services Inner Quest provided to Young Life.  The contract also identifies the parties as "contractor" and "client," respectively, and the very subject of the contract as a "project."  The variable price terms also indicate that this is a service contract.  Moreover, Inner Quest admitted that the nature of its business is that of a service provider.  Finally, no evidence suggests that the cost of

_____

[15] Inner Quest claims that the district court "speculated as to the 'intrinsic value' of the poles and swing bar, implicitly finding that the poles did not cost enough… to make the contract one for the sale of a good." IQ Br. at 12.  That is wrong.  Rather, the district court stated that because Inner Quest failed to provide a breakdown of the component and labor costs, the court would only be able to speculate about those costs, which it clearly refused to do. JA 408.  In its order on Inner Quest's motion for reconsideration, the district court made this abundantly clear, stating that it found *two* out of the three *Coakley* indicia supported its conclusion that the contract is for services. JA 428.

the materials used to construct the giant swing outweigh the costs of labor. Accordingly, because this contract is predominantly a service contract, the UCC does not apply to this dispute.

### B. Even if the Contract Is Predominantly One for Goods, South Carolina's UCC Choice of Law Does Not Displace the Common Law Choice of Law Rules Determining Which Law Governs the Enforceability of the Indemnity Clause

Even if the Court were somehow to find that the contract is primarily a contract for the sale of a good, that finding would not affect the determination as to which state's law governs the enforceability of the indemnity provision.

Inner Quest suggests that if the Court were to apply the UCC's choice of law provision, doing so would mandate application of *all* South Carolina substantive law, meaning that the Court would be required to apply S.C. Code § 32-2-10 instead of N.C. Gen. Stat. § 22B-1. That is wrong. By its very terms, the UCC's choice of law provision is expressly limited to a narrow scope. The provision simply says that where a contract for the sale of goods fails to specify the governing law, "the [South Carolina] *Uniform Commercial Code* applies," provided the transaction bears an appropriate relation to South Carolina. S.C. Code § 36-1-301(b) (emphasis added). The UCC's choice of law provision only instructs which states *commercial code* applies, not its common law or other statutory law. Nothing in § 36-1-301(b) directs courts to apply South Carolina law, such as S.C. Code § 32-2-10, that exists outside the UCC.

As the South Carolina Supreme Court explained in *Hitachi Electronic Devices (USA), Inc. v. Platinum Technologies, Inc.*, 366 S.C. 163, 170, 621 S.E.2d 38, 41 (2005), "when one or more particular provisions of the U.C.C. comprehensively addresses a particular subject" the UCC displaces the common law. When, however, the UCC is incomplete, "the common law provide[s] the applicable rules." *Id.* The UCC itself makes that clear. S.C. Code § 36-1-103(b).

Here, the UCC's choice of law provision is incomplete. As stated, it only provides the rule for deciding which state's commercial code applies *to issues governed by the code*. It speaks not at all to what choice of law rule applies with respect to issues outside of the scope of the code, such as the issue here, which is focused on the validity and enforceability of a contractual indemnity clause. Because the UCC contains nothing addressing the validity or enforceability of contractual indemnity clauses, the UCC's choice of law provision does not provide the choice of law rule to be applied to the particular issue at hand, namely, whether the indemnity provision is void or is enforceable. Stated differently, the UCC's choice of law provision does not displace the common law's choice of law rules regarding the validity of the indemnity provision. *Hitachi Electronic Devices*, 366 S.C. at 170, 621 S.E.2d at 41. Instead, the common law remains undisturbed for that particular choice of law question.[16]

---

[16] The cases Inner Quest cites when contending that all South Carolina law, not solely that body of South Carolina law contained in the UCC, should be applied, say no such thing. In *Myrtle Beach Pipeline Corp. v. Emerson Elec. Co.*, 843 F. Supp. 1027 (D.S.C.

40

The common law makes clear that "[m]atters bearing upon… the validity of a contract are determined by the law of the place where the contract is made." *Livingston*, 176 S.C. 385, 180 S.E. at 345.  North Carolina law thus governs the validity of the contract's indemnity provision, regardless of whether the contract is a contract for goods (which it is not) or for services (which it is).  Because N.C. Gen. Stat. § 22B-1 renders the indemnity provision void and unenforceable, this Court should affirm the district court's ruling to the same effect.

## III.    South Carolina Common Law Does Not Follow the Restatement (Second)'s Most Significant Relationship Test

Despite the long line of South Carolina cases holding that the South Carolina choice of law rule for issues concerning contract interpretation and enforcement is *lex loci contractu*,[17] Inner Quest argues that South Carolina instead adheres to the "most

---

1993), the court applied the UCC's choice of law provision to decide that South Carolina law governed a claim presented squarely under the UCC, namely a claim for breach of implied warranty asserted under S.C. Code. § 36-2-314. 843 F. Supp. 1033. The *Myrtle Beach Pipeline* court, therefore, never had to address whether common law choice of law rules determine the law governing issues not addressed within the four corners of the UCC.   Similarly, in *In re Merritt Dredging Co., Inc.*, 839 F.2d 203 (4th Cir. 1988), the issue was whether a charter agreement for a vessel constituted a security agreement under Article 9 of the UCC. 839 F.2d at 210.  Thus, just like the *Myrtle Beach Pipeline* court, the *In re Merritt Dredging* court did not speak to whether the UCC's choice of law provision controls the choice of law for issues that the UCC does not address.

[17] The district court listed several of these cases in its order denying Inner Quest's motion for reconsideration. JA 427.  In addition to those cases, *see also Livingston*, 176 S.C. 385, 180 S.E. 343, 345 and *Georgia Bank & Tr. Co. of Augusta*, 2010 WL 3271732, at *2.

significant relationship" test set out in the Restatement (Second) of Conflict of Laws. Lacking any support for this contention, Inner Quest actually cites South Carolina precedent further supporting the conclusion that South Carolina common law adheres to the *lex loci contractu* doctrine.

Inner Quest first cites to *McDaniel v. McDaniel*, 243 S.C. 286, 292, 133 S.E.2d 809, 813 (1963) and *Menezes v. WL Ross & Co., LLC*, 403 S.C. 522, 530 n.2, 744 S.E.2d 178, 182 n.2 (2013) for the proposition that South Carolina courts generally follow the *traditional* choice of law rules stated in the Restatement of Conflict of Laws.  IQ Br. at 32. The traditional choice of law rules, as stated in the Restatement (First) of Conflict of Laws, plainly follow the rule of *lex loci contractu*. Restatement (First) of Conflict of Laws § 332 (1934).  These rules differ from the *modern* choice of law rules — including the most significant relationship test — espoused in the Restatement (Second) of Conflict of Laws.

 Next, Inner Quest cites to *Lister v. NationsBank of Delaware*, N.A., 329 S.C. 133, 494 S.E.2d 449 (SC. App. 1997).  The *Lister* court, however, specifically rejected the choice of law rules found in the modern Restatement, including the most significant relationship test.  329 S.C. at 146, 494 S.E.2d at 456.  The *Lister* court followed the rule of *lex loci contractu,* holding that South Carolina law governed the issue of contract performance because the contract was performed in South Carolina. *Id.* at 144, 494, S.E.2d at 455.

Inner Quest also cites *Wellin v. Wellin*, 211 F. Supp. 3d 793 (D.S.C. 2016) in an attempt to establish that South Carolina courts have rejected the traditional rules of the First Restatement in favor of the modern rules stated in the Second Restatement. That contention is misguided. The *Wellin* court applied the Second Restatement's choice of law rule because the First Restatement does not explicitly address the choice of law rule applicable to privilege issues. 211 F. Supp. 3d at 801. *Wellin*, therefore, does not aid Inner Quest's unfounded position.

Finally, Inner Quest notes that courts outside of South Carolina have abandoned the *lex loci contractu* rule. IQ Br. at 26-27. Inner Quest apparently does not realize that federal courts sitting in diversity must apply state law as announced by the state's highest court, and cannot reject it out of a belief that better law exists in other jurisdictions. *Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002).

## IV. South Carolina Public Policy Does Not Preclude Enforcement of N.C. Gen. Stat. § 22B-1

In its final attempt to avoid application of N.C. Gen. Stat. § 22B-1, Inner Quest insists that enforcing that statute would violate South Carolina's public policy. Inner Quest argues that § 22B-1: is in conflict with South Carolina's public policy of freedom to contract; conflicts with South Carolina's own statute invalidating contractual indemnity provisions; and was enacted to benefit those who are using or own property in North Carolina. These arguments have no merit.

As stated in *Rauton v. Pullman Co.*, 183 S.C. 495, 191 S.E. 416, 422 (1937), South Carolina generally will refuse to apply a foreign state's law on public policy grounds only when that law is against "good morals or natural justice or that for some other such reason the enforcement of it would be prejudicial to the general interests of [South Carolina] citizens." Thus, by example, South Carolina courts have found violations of public policy where another state's laws address issues such as "prohibited marriages, wagers, lotteries, racing, contracts for gaming or the sale of liquors." *Id.*; *see also, e.g.*, *Boone v. Boone*, 345 S.C. 8, 14, 546 S.E. 2d 191, 194 (2001) (invalidating another state's law, on the basis it was contrary to "natural justice," because it precluded wife from maintaining action against husband).

Inner Quest fails to explain how enforcing § 22B-1 would offend South Carolina's expressed concept of good morals or natural justice, or how it would prejudice the citizens of South Carolina. In fact, in direct conflict with Inner Quest's freedom of contract contention, the Supreme Court of South Carolina has stated that "[i]t is axiomatic that 'freedom of contract is subordinate to public policy . . . .' " *Nationwide Mut. Ins. Co. v. Rhoden*, 398 S.C. 393, 398, 728 S.E.2d 477, 480 (2012) (quoting *Branham v. Miller Elec. Co.*, 237 S.C. 540, 545, 118 S.E.2d 167, 169 (1961)).[18]  It is no surprise, then, that South Carolina courts have generally

---

[18] The only case Inner Quest cites in support of its position that South Carolina favors the policy of freedom to contract is *Ashley II of Charleston, LLC v. PCS Nitrogen, Inc.*, 409 S.C. 487, 763 S.E.2d 19 (2014).  In that case, the South Carolina Supreme Court

recognized that public policy considerations sometimes justify limiting a party's ability to contractually exculpate itself from liability. *See, e.g.*, *Pride v. S. Bell Tel & Tel. Co.*, 244 S.C. 615, 619-20, 138 S.E.2d 155, 157 (1964) (holding contractual limitation of liability in contract for advertisement of dental office was against public policy). Inner Quest's attempt to rely on South Carolina's policy favoring the freedom of contract must be rejected.

Inner Quest next argues that South Carolina public policy prohibits the application of N.C. Gen. Stat. § 22B-1 because that statute conflicts with S.C. Code § 32-2-10. This argument is also contrary to established South Carolina law. As stated explicitly in *Dawkins v. State*, 412 S.E.2d 407, 408 (S.C. 1991), "the fact that the law of two states may differ does not necessarily imply that the law of one state violates the public policy of the other." Thus, South Carolina has on many occasions applied another state's conflicting law. *See, e.g.*, *Nash v. Tindall Corp.*, 650 S.E.2d 81, 84 (S.C. Ct. App. 2007) (holding that application of a statute of repose shorter than South Carolina's statute of repose does not violate South Carolina public policy); *Higdon v. Nestle Purina Petcare Co.*, C.A. No. 8:143737-HMH, 2014 WL

---

declined to apply a South Carolina common law rule, which would have invalidated a contractual provision, because the deterrent purpose of the rule was not being served. *Id.* at 491, 763 S.E.2d at 21. The South Carolina Supreme Court merely acknowledged that this holding comported with South Carolina's "regard for parties' freedom to contract." *Id.* at 492, 763 S.E.2d at 22. That statement lends no aid to Inner Quest's contention that South Carolina's policy of freedom to contract required the district court to refuse to enforce N.C. Gen. Stat. § 22B-1.

12613271, at *2-3 (D.S.C. Oct. 28, 2014) (unpublished) (holding South Carolina public policy not violated by applying foreign state's law that does not recognize breach of contract accompanied by fraudulent act despite South Carolina law that does recognize such an action).

Finally, Inner Quest argues that the application of N.C. Gen. Stat. § 22B-1 violates South Carolina public policy because that statute, supposedly, was enacted only to benefit those who own or use North Carolina property. Inner Quest's argument is patently based on a false premise. Nothing in § 22B-1 supports the spin Inner Quest tries to put on it. So, Inner Quest attempts to import language from an entirely different statute, N.C. Gen. Stat. § 22B-2, into § 22B-1. Section 22B-2 does not modify or even relate to § 22B-1. The two statutes address wholly different public policy concerns. The mere fact that the statutes sit side-by-side in the North Carolina code provides no basis to impose language from one into the other, as Inner Quest would have this Court do.

**V.    The District Court Correctly Granted Summary Judgment in Favor of Young Life With Respect to Inner Quest's Cross-Claim for Equitable Indemnity**

"A right of indemnity exists whenever the relation between the parties is such that either in law or in equity there is an obligation on one party to indemnify the other, as where one person is exposed to liability by the wrongful act of another in which he does not join." *Stuck v. Pioneer Logging Mach., Inc.*, 279 S.C. 22, 24, 301

S.E.2d 552, 553 (1983) (citations omitted).  The Supreme Court of South Carolina has imposed particular requirements on parties seeking equitable indemnification from another party.  *McCoy v. Greenwave Enterprises, Inc.*, 408 S.C. 355, 359, 759 S.E.2d 136, 138 (2014).  Critically, a requisite "'special relationship between the parties must be established.'" *Id.* (*quoting Toomer v. Norfolk S. Ry. Co.*, 344 S.C. 486, 492, 544 S.E.2d 634, 637 (Ct. App. 2001)).

As the Supreme Court of South Carolina has explained, "[a] sufficient relationship exists when the at-fault party's negligence or breach of contract *is directed at the non-faulting party . . . .*"[19] *Winnsboro v. Wiedeman–Singleton, Inc.*, 307 S.C. 128, 132, 414 S.E.2d 118, 121 (1992) (emphasis added).  As the district court explained quite nicely, another way to state this rule is that the at-fault party's wrongful acts must "flow through the non-faulting party to harm a third party" in order to create the requisite special relationship. See JA 413 (*citing Toomer*, 344 S.C. at 637 n. 13).

Although there is no law supporting its argument, Inner Quest attempts to convince this Court that the existence of any contractual relationship between two parties will establish the special relationship required by *Winnsboro*. IQ Br. at 34, 37.  To support this effort, Inner Quest grossly misconstrues *Toomer*.  Inner Quest

---

[19] Given the clear statement from the *Winnsboro* court, Inner Quest's contention that no South Carolina court has "itemized" what constitutes the requisite special relationship is puzzling.  IQ Br. at 34.

47

quotes from the *Toomer* opinion's "Factual/Procedural Background" section that itself was quoting the trial court's summary judgment order. IQ Br. at 34. The *Toomer* court plainly was quoting the trial court in the "Factual/Procedural Background" section of its opinion simply to explain what the trial court had ruled. Inner Quest, nonetheless, asserts that since *Toomer* ultimately affirmed the trial court, it must have "implicitly agreed" that the existence of any contractual relationship "is sufficient to create a special relationship between parties entitling one to equitable indemnification from the other…." IQ Br. at 34. Not only does that lack any support from *Toomer*, but it also rests upon a wildly strained reading of even the trial court's summary judgment opinion being reference therein.

Perhaps aware that its claim about *Toomer*'s "implicit holding" is so patently absurd, Inner Quest next argues that *Addy v. Bolton*, 257 S.C. 28, 31-32, 183 S.E.2d 708, 708-09 (1971) and *Jourdan v. Boggs/Vaughn Contracting*, 324 S.C. 309, 311-14, 476 S.E.2d 708, 709-11 (Ct. App. 1996) held that the existence of any contract establishes the requisite special relationship. IQ Br. at 35. Those cases held no such thing. Rather, in both cases, a right to indemnity arose not because the parties had a contractual relationship, but because the at-fault party's negligence flowed through the non-faulting party to harm a third person. *See Addy*, 257 S.C. at 31, 183 S.E.2d at 708 (where contractor negligently started fire in building owned by landlord who hired him to repair it, thereby destroying property owned by landlord's tenant,

landlord could seek equitable indemnity from contractor for claims that tenant asserted against landlord); *Jourdan*, 324 S.C. at 311, 476 S.E.2d at 709 (when DOT contractor performed roadwork according to DOT specifications and motorcyclist later crashed due to defect in road, contractor could maintain indemnity claim against DOT if he could prove that DOT's specifications were faulty and thereby caused the accident).

Unsurprisingly, the cases permitting equitable indemnity claims to proceed consistently involve the indemnitor's negligence flowing through the indemnitee to injure or damage a third party. *See, e.g., McCoy*, 408 S.C. at 360, 759 S.E.2d at 138 (2014) (holding Greenwave could maintain equitable indemnity claim against Miles where Miles sold real property to Greenwave knowing there had been a petroleum leak on the property, which damaged neighbors who sued Greenwave); *Stuck*, 279 S.C. at 24-25, 301 S.E.2d at 553 (holding Stuck had viable equitable indemnity claim against Pioneer Logging where Pioneer Logging sold truck to Stuck with latent defect, resulting in Stuck's employee losing control of truck and injuring third parties); *Stoneledge at Lake Keowee Owners' Ass'n, Inc. v. Clear View Const., LLC*, 413 S.C. 615, 625, 776 S.E.2d 426, 431 (Ct. App. 2015) (where subcontractor negligently performed stonework on building thereby damaging homeowners who then sued general contractor and subcontractor, general contractor could seek equitable indemnity from subcontractor).

The simple bottom line is, as the district court correctly explained, that "courts interpreting South Carolina law have consistently required that the at-fault party's wrongful acts flow through the non-faulting party to harm a third party." JA 413. The mere existence of a contractual relationship will not suffice. Here, as the district court correctly held, Young Life's alleged negligence in no way flowed through or in no way was directed at Inner Quest. *Id*. Thus, Inner Quest's equitable indemnity claim fails.

Lacking any argument under South Carolina law as it actually exists, Inner Quest makes yet another attempt to invent law. Inner Quest argues that "other factors" establish a special relationship. IQ Br. at 37. For instance, Inner Quest argues that because Young Life hired Inner Quest to construct other swings in the past, and because Young Life agreed to operate the Freebird in accordance with Inner Quest's design and in accordance with Adventure Experiences' training, this should have caused Young Life to foresee that its allegedly negligent acts would expose Inner Quest to the costs of defending a lawsuit. Then, Inner Quest asserts that this foreseeability *itself* permits an equitable indemnity claim. Unable to find any authority supporting this contention, Inner Quest curiously cites to *Winnsboro*. *Winnsboro*, however, holds that for a non-faulting party to assert a viable equitable indemnity claim for litigation costs, he must show – *in addition to* the existence of a

special relationship, *and not instead of it* – that litigation costs were a foreseeable result of the faulting party's actions.  307 S.C. at 132, 414 S.E. 2d at 121.

As a last ditch effort, Inner Quest claims it enjoys a viable equitable indemnity claim because Young Life breached the "Staff Training" and "Your Responsibilities" sections of the contract.  As noted by the district court, however, Inner Quest did not allege, nor did it argue below, that Young Life breached its contract with Inner Quest. JA 413.  Inner Quest is therefore precluded from making this allegation and argument for the first time on appeal.  *See Williams v. Professional Transp. Inc.*, 294 F.3d 607, 613 (4th Cir. 2002) (holding because appellant failed to present a specific contention regarding the interpretation of a contract to the district court, the contention was not properly preserved for appeal).

In any event, Inner Quest's new contention that Young Life breached the contract is absurd.  First, the "STAFF TRAINING" paragraph that Inner Quest now claims Young Life breached is predominantly an advertisement for Inner Quest's training services that it offers for $1,075 per day. JA 304.  If that paragraph contains any requirement at all, it merely indicates that Young Life was to ensure that its employees receive basic level swing operation training.  It is undisputed, as Inner Quest well knows, that Young Life's employees received such training from ACCT Professional Vendor Member Adventure Experiences before the Freebird ever carried its first rider.  JA 312, 315.

51

As regards the "YOUR RESPONSIBILITIES" page of the contract, it mostly speaks to things that Inner Quest's clients should be "willing" to do.  JA 305.  It lacks any specific instruction for Young Life do anything, other than perhaps to ensure its employees received the same training discussed in the preceding paragraph, and to implement policies and procedures for use with Young Life's challenge course, which, as Inner Quest well knows, Young Life, in fact, did. JA 415-417.

In conclusion, Inner Quest failed to establish the special relationship required to support its equitable indemnity claim, and thus the district court properly granted Young Life's summary judgment motion as to that claim.

## CONCLUSION

Young Life respectfully requests that this Court affirm the district court's grant of summary judgment to Young Life on both of Inner Quest's crossclaims, and also affirm the district court's denial of Inner Quest's summary judgment motion as to those same crossclaims.

Respectfully submitted,

/s/ Jack M. Strauch
Jack M. Strauch (Bar No. 52425)
jstrauch@sgandm.com
Strauch Green & Mistretta, P.C.
154 Dornach Way
Bermuda Run, NC  27006
Telephone: (336) 837-1061
Fax: (336) 725-8867

September 22, 2017                    *Counsel for Defendant, Young Life, Inc.*

52

## CERTIFICATE OF COMPLIANCE

1.    This document complies with type-volume limits because, excluding the parts

of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure

statement, table of contents, table of citations, statement regarding oral

argument, signature block, certificates of counsel, addendum, attachments):

this document contains <u>12,819</u> words.

2.    This document complies with the typeface requirements because:

this document has been prepared in a proportional spaced typeface
using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.


Dated: September 22, 2017          /s/ Jack M. Strauch
                                   Jack M. Strauch

                                   *Counsel for Appellee*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on September 22, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all the registered CM/ECF users.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Priscilla C. Winkler
Priscilla C. Winkler
*Gibson*Moore Appellate Services, LLC
206 East Cary Street
Post Office Box 1460 (23218)
Richmond, VA  23219
(804) 249-7770 –  Telephone
(804) 249-7771 –  Facsimile
priscilla@gibsonmoore.net
